This is a workers' compensation case.
After ore tenus proceedings held in September and December 1990, the trial court determined that Brenda Ann Rogers (employee) had suffered an injury to her right upper extremity as a result of a work-related accident occurring while she was in the employ of Chrysler Motors Corporation (employer). The court then found that the employee had suffered a 5% decrease in her ability to earn wages as a result of the injury. Contending that her loss of ability to earn is greater than that found by the trial court, the employee appeals. We affirm.
The dispositive issue on appeal is whether the trial court erred in finding that the employee suffered only a 5% decrease in her ability to earn wages.
At the outset we note that appellate review in workers' compensation cases is a two-step process. First, this court will look to see if there is any legal evidence to support the trial court's findings. If such evidence is found, this court will then determine whether any reasonable view of that evidence supports the trial court's judgment. Ex parte EastwoodFoods, Inc., 575 So.2d 91 (Ala. 1991).
The record reveals that the employee is 35 years old, has obtained a GED, and has earned a degree in electronic assembly from a trade school. Prior to her work with the employer, she was employed as an electronic technician and quality control inspector. She has worked for the employer since 1983 and has performed various jobs, most of which are on an assembly line. She testified that these jobs typically require repetitive lifting and twisting motions with her hands and wrists as she assembles small computer components.
The employee avows that she first began to feel cramping in her wrists and experience numbness in her hands while at work *Page 369 
in August 1987. Over the next three months, the numbness persisted and the pain grew progressively worse in her right arm, extending to her elbow. On November 18, 1987, she left work and went to a hospital emergency room for treatment. She testified that at the time she entered the hospital, her right arm was swollen and she had no feeling in three fingers of her right hand. The emergency room doctor advised the employee not to work and referred her to Dr. Charles Morley, an orthopedic surgeon.
Dr. Morley, who, like the other medical experts in this case, testified by deposition, stated that the employee informed him that she had experienced slight numbness in her hands prior to August 1987. After performing a rheumatology study and a neurological evaluation of the employee, he was unable to find objective indications of the pain and tenderness of which she complained. He concluded that her symptoms indicated a mild rheumatoid arthritis, a condition he believed to be unrelated to the employee's work. When the employee continued to complain of pain, Dr. Morley suggested that she take time off from work and referred her to another orthopedic surgeon, Dr. Philip A. Maddox.
Dr. Maddox first saw the employee in December 1987. The employee indicated to Dr. Maddox that the pain and swelling in her right arm had subsided to a degree since she had been away from work. Dr. Maddox then suggested that she return to work because he wanted to see if the condition would recur at her job. The employee testified that when she returned to work her problems began anew. She returned to see Dr. Maddox in January 1988. At that time Dr. Maddox concluded that the pain and numbness could possibly be symptoms of an "overuse syndrome" that resulted from repetitive use of the hands. Dr. Maddox put the employee's right arm in a cast to limit movement and restricted her from working at her job with the employer. When the employee continued to complain of pain, Dr. Maddox ordered a bone scan and a nerve conduction test; both studies showed results within normal limits. Dr. Maddox testified that by treating the employee's arm with electrical stimulation, he was able to alleviate some of her pain. However, the employee continued to experience pain over the next 3 months.
In May 1988 Dr. Maddox decided that the employee could return to work but that she needed to restrict her movements if she wished to avoid exacerbating her symptoms. However, the employee testified that the employer's safety director would not allow her to work with the medical restrictions prescribed by Dr. Maddox. The employer then sent the employee to a neurosurgeon, Dr. Swaid N. Swaid. After performing several neurological tests on the employee, Dr. Swaid ruled out neurological injuries; however, he said that the scope of these tests was limited to detecting neurological deficits.
The employee testified that she tried repeatedly to return to work during the summer of 1988, but that each time she did, the pain from her injury prevented her from performing her job. Dr. Ray Fambrough, an orthopedic surgeon who examined the employee in September 1988 when she continued to complain of persistent pain, testified that if the employee's pain recurred every time she returned to work, he would recommend that she seek employment that did not require lifting and repetitive twisting of the wrist.
Dr. Robert Hunt, a rheumatologist, saw the employee in January 1989 and performed neurological and musculoskeletal examinations. According to Dr. Hunt, some of the employee's responses to the tests were typical of a "thoracic outlet syndrome," a constriction affecting the blood or nerve supply to the arm; however, Dr. Hunt testified that such responses are not dispositive of the condition and frequently occur in people without the condition. He also indicated that the condition could be caused by the structure of the body or by the requirements of one's work. A CAT scan of the employee indicated nothing abnormal. Dr. Hunt's only definitive diagnosis of the employee was that she suffered from a chronic "pain syndrome," which means that the patient complains of pain but the physician cannot determine what is *Page 370 
causing the pain. He also suggested that some psychiatric factors may have supervened to create the pain. Dr. Hunt treated the employee's pain with injections and instructed her to refrain from any work for the next few months that might involve lifting weights of over 5 pounds.
That same month, still complaining of pain, the employee returned to see Dr. Maddox. Dr. Maddox suggested that in order to avoid pain she refrain from activities including lifting, pushing, pulling, and twisting of the arm. The employer's safety director informed the employee that the employer had no job she could do, and the employee remained off work from January 1989 to January 1990. The employee testified that each of the several times she returned to work for the employer, the pain resumed. She testified that even after the employer had installed robots on its assembly line, she was still required to make movements that caused severe pain. She last attempted to work between September and December 1990, the time between the two proceedings that are the basis of this appeal; however, whenever she went back to work, she says, the pain recurred. The employee testified that she had been notified by the employer that her job was in jeopardy due to the time she had missed.
The trial court also considered the testimony of two vocational specialists, Anne Darnell and Mary House Kessler. Darnell testified that if the employee were to lose her job as a result of the injury, she would suffer a 46 to 50% loss of ability to earn. She also stated that, due to employer reluctance to hire previously injured workers, the employee would have difficulty finding another job and that if she did find a job, she would have difficulty progressing beyond entry-level earnings. Kessler testified that the employee's injury could result in a loss of access to approximately 66% of the jobs previously available to her. She also testified that if the employee's work for the employer caused her symptoms to recur, she should seek a new job. These determinations were based in part on finding that several doctors had recommended work restrictions for the employee if she were to work for the employer, including limiting the use of her arm and limiting the amount of weight she lifted. Kessler averred that if the employee had to find another job, her salary would fall from $616.40 per week to approximately $220 per week.
The employee contends that the trial court's finding as to her loss of earning ability was not supported by the legal evidence. She argues that her own testimony, her husband's testimony, and the testimony of the medical and vocational experts indicated a loss of earning ability substantially higher than that found by the court. The employer, however, maintains that there was sufficient evidence to support the trial court's finding. It also asserts that the trial court in workers' compensation cases has considerable discretion when assessing the credibility of witnesses and that it is not bound by experts' conclusions.
Our inquiry in workers' compensation cases is limited to a determination of whether there is any legal evidence to support the findings of the trial court. B.F. Goodrich Co. v. Campbell,445 So.2d 920 (Ala.Civ.App. 1984). This court cannot, and does not, weigh the evidence on appeal or make any determinations as to the sufficiency thereof. Cook v. Munn,528 So.2d 881 (Ala.Civ.App. 1988). Moreover, it is well established that a trial court has much discretion in determining an employee's loss of earning ability in workers' compensation cases. International Paper Co. v. Rogers,500 So.2d 1102 (Ala.Civ.App. 1986). Further, a trial court is not bound by the opinions of expert witnesses, even if the testimony is uncontroverted. Clark Lumber Co. v. Thornton,360 So.2d 1019 (Ala.Civ.App. 1978).
The trial court stated in its order that it had considered the testimony of the vocational specialists, as well as that of the many treating physicians and the employee herself. Testimony adduced from the medical experts was inconclusive as to the origin of the pain and as to the degree that it might be attributed to an on-the-job accident. None of the examinations performed by the physicians indicated a loss of range *Page 371 
of motion in the employee's arm, and none of the many tests that they administered indicated neurological or circulatory problems. The physicians were essentially unable to diagnose the source of the employee's pain. While a number of the treating physicians recommended that the employee limit use of her right arm and hand, such prescriptions were given in response to her complaints of subjective symptoms. In short, based on the medical testimony, the trial court could have concluded that the employee's injury was not so serious as to deprive her of over 5% of her ability to earn wages. At the time of trial, the employee continued to work for the employer, and as we have noted, the testimony submitted by the physicians is inconclusive as to the seriousness of the injury.
If any legal evidence supports the trial court's findings and any reasonable view of that evidence supports the trial court's judgment, this court will affirm. Eastwood Foods, 575 So.2d 91. We find such evidence in the present case. Therefore, we affirm the trial court's judgment.
AFFIRMED.
ROBERTSON, P.J., and THIGPEN, J., concur.